**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Dominique Cole and Jerome Beasley, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 21-cv-4714 |
| v. | ) | |
| | ) | JURY DEMANDED |
| Railworks Maintenance of Way, Inc., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>COMPLAINT</u>

NOW COMES, the Plaintiffs, DOMINIQUE COLE ("Cole") and JEROME BEASLEY ("Beasley") (collectively "Plaintiffs"), by and through their attorneys, Cass Casper and NaVarrio Wilkerson, of Disparti Law Group, P.A., bring this Complaint against the Defendant, Railworks Maintenance of Way, Inc. ("RailWorks"), state as follows:

### INTRODUCTION

1. RailWorks Maintenance of Way, Inc. ("RailWorks") maintains railroad rights-of-way for client railroads. RailWorks employs welders and welder's helpers on RailWorks' welding crews, like those the Plaintiffs worked on.

2. Welders and Welder Helpers are employed to work on and repair the railroad tracks that RailWorks services.

3. As welders and welder helpers, the Plaintiffs traveled to tracks and worked on several sites for multiple days at a time.

4. While on assignment, Cole and Beasley were subjected to hostile work environment, racial discrimination, and retaliation.

5. The Plaintiffs engaged in protected activity when they complained of and reported discrimination to the Defendant.

6. The Plaintiffs were subject to retaliation after complaining of and reporting racial discrimination and retaliation.

## JURISDICTION AND VENUE

7. The Court has subject matter jurisdiction over this case under 28 USC §1331 because this action arises under federal law, specifically, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, § et seq., and 28 U.S.C. 1343(a)(4).

8. Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. §1391. On information and belief, the Defendant resides and operates offices in this judicial district, the Plaintiffs reside in this judicial district.

## PARTIES

9. Plaintiff Dominique Cole is a resident of Chicago, Illinois. He was employed by RailWorks on or about June 2, 2019, until his termination as of July 26 2019, as part of the events underlying this Complaint.

10. Plaintiff Jerome Beasley is a resident of Chicago, Illinois. He was employed by RailWorks on or about October 28, 2018, until his termination as of September 13, 2019, as part of the events underlying this Complaint.

11. The Defendant, RailWorks Maintenance of Way, Inc, operates track service offices in Chicago, Illinois, as well as throughout the United States.

2

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

12. All administrative remedies for the purposes of the Title VII claim have been exhausted. All conditions precedent to the institution of this lawsuit have been fulfilled including of receipt of the right-to-sue letters issued by the EEOC on June 29, 2021. A copy of the Right-to-sue letter is attached hereto as *Exhibit A*.

13. Plaintiffs commence this lawsuit within the 90-day period of the EEOC right-to-sue-notice.

## FACTS COMMON TO ALL COUNTS

14. Railworks hired Beasley on or about October 28, 2018, to work as a welder helper.

15. After the 2019 season began, Beasley was promoted to welder on or about June 17, 2019.

16. As both welder and welder helper, Beasley traveled to tracks and worked on several sites for multiple days.

17. On July 24, 2019, Beasley, along with other RailWorks' employees were working on a railroad right-of-way near Louisville, Kentucky.

18. The four laborers were Jerome Beasley, Mathew Folkwein, Dominique Cole, and Phillip Perry.

19. At all relevant times, Welding Supervisors Kris Hyder ("Hyder") and Steven Keller ("Keller") were the RailWorks supervisory personnel on site.

### Dominique Cole and Jerome Beasley Report Discrimination and Harassment

20. On July 24, 2019, Cole contacted Respondent's client supervisor Mr. Dexter about discrimination and ongoing harassment from another worker, Matthew Folkwien ("Folkwein").

21. Folkwein had a history of calling Cole and others "niggers" in conversations and most recently told Cole to "suck my dick."

22. Cole is an African-American heterosexual male.

23. Beasley is an African-American heterosexual male.

24. Cole also reported the same discrimination and harassment to RailWorks' on-site supervisors, Danny Bridges and Kris Hyder, via text message on July 24, 2019, stating as follows:

    "[Wed, Jul 24, 7:19 PM] Hello, this is Dominque Cole I am contacting you because I have a problem with one of my Coworkers. Today as we were waiting for track time I was sitting in the truck and I was approached by Matt Folkwein and he said to me to suck his dick. I took it very disrespectful and it bothers me that another man would say that to me at work. I continued with my day after told me that. **This is not the first time he has said offensive things to me. At a point of time he called me a Nigger Several times, Jerome witnessed the whole situation. I have tried to blow it off but I see it going to continue happening…**" *See attached Exhibit B (emphasis added)*

25. On July 25, 2019, while waiting outside to begin their workday, Hyder and Keller brought all four laborers together outside to discuss the report as a group.

26. Upon information and belief, there was no formal process or individual discussions between the supervisors or employees prior to the group discussion.

27. During the group discussion, Cole reported Folkwein's statements and harassment were not a one-time off-color joke. Instead, he explained the statements and harassment were ongoing, and other occurrences predated his July 24, 2019, complaint.

28. During the meeting, Beasley confirmed to both Hyder and Keller that Folkwein did, in fact, make the discriminatory statements as described in Cole's text message.

29. Beasley also submitted a written statement regarding the July 24, 2019, incident, "I Jerome Beasley was sitting in truck with Mr. Cole and heard Mr. Folkline use explicit language to Mr. Cole that was inappropriate to Dominique." *See attached Exhibit C*.

30. During the same meeting, Beasley, in no uncertain terms, verbally informed both supervisors that Folkwein called he, Cole, and Mr. Phillip Perry "niggers" on a daily basis.

31. On or about July 24, 2019, Cole and Beasley informed supervisors that Folkwein asked Cole to "suck my dick."

32. In addition, Cole's text message that refers to be being called a "nigger" several times, Cole also verbally confirmed this with the supervisors during the meeting.

*33.* Folkwein admitted to supervisors that he told Cole to "suck my dick." *See Exhibit D*.

34. Folkwein also admitted he called Cole "nigga" throughout his conversations with Cole.

35. RailWorks responded by giving Folkwein a slap on the wrist by simply being told not to use inappropriate language.

36. Folkwein received no discipline and was immediately allowed to go back to work.

37. At the conclusion of the discussion, Hyder told Beasley and Cole, "Lets keep this between us. What is said between railroad workers stays between railroad workers" and

"We don't want this to get out because it would hurt our chances to keep our contract with the client."

38. Hyder instructed the Plaintiffs to keep this issue quiet and not to contact anyone else, including the Defendant's client, about the discrimination or harassment in order protect the Defendant's business relationships with its clients.

39. All of the work crews were dispatched to work sites.

40. Immediately thereafter, the four laborers were split into two groups and sent to begin work.

41. Cole and Beasley were paired in one group on the railroad and Mr. Perry (also African American) was made to work with Folkwein in the other.

42. All other crews and workers were sent to work on a different job site.

43. The supervisors chose to not to separate Cole and Beasley from Folkwein by assigning either of the four employees to a different job site.

44. Instead, the Defendant's supervisor exacerbated the tension by instructing only the four employees to work on the same track, less than ten (10) yards away.

45. While the other crews were sent to a different location, Cole, Beasley, Perry, and Folkwein were made to work together in a secluded area.

**Dominique Cole and Jerome Beasley Suffer Immediate Retaliation**

46. On July 25, 2019, Folkwein, still angry that Cole and Beasley reported his actions, began welding in such a way as to purposely shoot sparks onto Cole and Beasley.

47. The shooting sparks were extremely hot and made contact with the Plaintiffs' skin and clothing.

48. The sparks were so hot that they actually started a fire on the nearby wood, which Mr. Cole put out.

49. Cole, with the agreement and knowledge of Beasley, went to supervisors Hyder and Keller to report the sparks from Mr. Folkwein and requested Hyder and Keller to order Folkwein to put on a spark-shield[1] for their safety.

50. The supervisors, Keller and Hyder, simply continued with their conversation between themselves, taking no action, causing Cole or Beasley's visible discomfort, physical discomfort, and anxiety, making the Plaintiffs' duties impossible to perform.

51. Neither supervisor took steps to stop Folkwein's clear and immediate retaliation.

52. Seeing that the supervisors were not going to address their grievance, Cole directly requested Folkwein put on a spark-shield because he and Beasley were being bombarded with hot sparks on their person.

53. Folkwein ignored Cole's request, responded "no" and continued to shoot incendiary sparks at Beasley and Cole, retaliating for their reports, putting their personal safety at risk.

54. This harassment, allowed by their supervisors' inaction, lead to Cole's and Beasley's enhanced frustration. Cole and Beasley became increasingly frustrated as this harassment continued and their supervisors' neglect and disinterest forced them to stop working on the track for a period.

55. On July 25, 2019, Dominique Cole was terminated from his employment.

---

[1] The majority of railroad fires are caused from grinding or welding on the rail. Grinding and welding rail can produce sparks, which is why it is important to follow proper fire risk assessment and mitigation procedures before starting the job. Welders spark shields are metal shields that cover the welding area and prevents the sparks generated from railroad welding from going beyond the immediate work area. They also prevent sparks from creating nearby fires of the surrounding area. https://industryrailway.com/blog/fire-prevention-and-safety/

56. On July 25, 2019, Dominique Cole contacted Kris Hyder via text message:

**Cole:** "Am I fired?

**Cole:** Am I terminated? I just need to know what's going on??" (3:20 pm)

**Cole:** "What's going on Kris I was wondering what's going on with my situation. I was told by Danny that I won't be working for NS anymore so will I be working for CN?? Can you please answer me back!!" (5:08 pm)

**Hyder:** "Your services are no longer needed. Good luck with your future endeavors."

### Beasley's Constructive Termination "Layoff"

57. On or about September 13, 2019, Jerome Beasley was working with his partner Phillip Perry. At that point, Beasley had been working as an employee of the Respondent since October 28, 2018.

58. After starting his career as a Welder's Helper, he took the prerequisite training and was promoted to Welder in June of 2019. Mr. Beasley had long-standing history and experience welding for the Respondent and Respondent's client.

59. Throughout his employment, he had never been taken off the tracks for poor performance.

60. From June to September of 2019, he had been successfully welding without being removed, despite being observed not only Respondent's supervisors, but also the supervisors of Respondent's clients as well.

61. Beasley not only satisfactorily performed his job requirements to be promoted, but also satisfactorily performed them thereafter, especially when compared to similarly situated welders, such as Mr. Folkwein.

8

62. In particular, upon information and belief, Beasley had a minimum of seventy-five (75) welds, all of which were available for review throughout his time with the Defendant.

63. Generally, when a weld is found to be unsatisfactory, the welder is informed immediately, followed by an explanation regarding its defective nature.

64. The welder is immediately asked to correct the welds on the spot. Welds were observed quickly, without delay.

65. Welds were also signed off on by superiors upon inspection.

66. Beasley rarely, if ever, received any notice that his welds were in anyway not meeting the standards of the Respondent or Respondent's clients.

67. However, when he did receive such notice, RailWorks never instructed him on how to correct the welds.

68. Beasley did not receive any additional training, while other non-African American welders, such as Folkwein, received additional training and instruction.

69. On September 13, 2019, after correcting a weld from the prior day, he was asked to continue to do more welds. He did at least two more welds that day. *See attached exhibit E*. At this point he was never instructed on the alleged shortcomings of the prior day's weld.

70. On September 13, 2019, Mr. Beasley completed an additional weld, at no time did RailWorks inform Beasley that there were any issues with the additional welds. And again, performing a second weld without issue, immediate attention, scrutiny, or instruction.

71. In September of 2019, Mr. Beasley observed Mr. Folkwein execute poor welds in front of the supervisors and in the presence of other welders.

72. Upon belief, RailWorks supervisors took no remedial action against Folkwein.

73. In fact, during the month of September, just before Beasley was removed from work, Folkwein was observed making several welds in front of Defendant's supervisors and client supervisors for Canadian National.

74. Upon information and belief, Canadian National ("CN") was the same client Beasley was currently welding for when he was terminated.

75. The supervisors responded to Folkwein's problematic welds by simply asking him to re-weld the track and continue on.

76. Folkwein was still never removed and was allowed to continue welding.

77. On or about September 13, 2019, RailWorks removed Beasley from the tracks, allegedly for "bad" welds.

78. On or about September 13, 2019, Beasley was constructively terminated from work because "they cut your crew completely off", which the Defendant calls "laid off." *See attached Exhibit F.*

79. On belief, RailWorks had several open welding positions.

**After Beasley's Termination "Layoff"**

80. In September of 2019, after being removed from his duties, Beasley repeatedly reached out to the Defendant to be placed on another RailWorks project.

81. On October 15, 2019, Jerome Beasley contacted his former supervisor Hyder via text, "How's it going kris no word on anything yet." *See attached Exhibit F.*

82. Mr. Hyder after informing Mr. Beasley "...No word yet..." he instructed him to contact Jason Deaton ("Deaton") *See attached Exhibit F.*

83. Shortly thereafter, Jerome Beasley contacted Deaton as follows:

Beasley: "How you doing Jason this Jerome I was reaching out to you concerning my employment status or to see if it's possible I can 3 man with Donnie."

Deaton: "We currently don't have anything open right now, **they cut your crew off completely**. We will let you know if something comes up"

Beasley: "I didn't no that but **they let Matt still work under the same circumstances**"

Deaton: "Not the same circumstances, *they will not allow you to weld on CN because of workmanship"(emphasis added)*

Beasley: **What about as a helper. But whatever come up just let me no thanks Jason. And to my knowledge Matt lost a weld and had incorrect also**." *See attached Exhibit F.*

### COUNT I
### Violation of Title VII
### HOSTILE WORK ENVIROMENT
### (Plaintiffs against Defendant)

84. Plaintiff restates, realleges, and incorporates by reference all other paragraphs of this Complaint as if fully stated herein.

85. Where workplace is permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter conditions of victim's employment and create abusive working environment, Title VII is violated. Civil Rights Act of 1964, § 703(a)(1), as amended, 42 U.S.C.A. § 2000e–2(a)(1). *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002)

86. Hostile work environment claim is comprised of series of separate acts that collectively constitute one "unlawful employment practice," for purposes of charge filing requirement of Title VII. Civil Rights Act of 1964, § 706(d)(1), as amended, 42 U.S.C.A. § 2000e–

5(e)(1). *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002)

87. "Hostile work environment," within meaning of Title VII, is one that is both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq. *Avila v. Bd. of Regents of the Univ. of Wisconsin Sys.*, 95 F. Supp. 3d 1074 (E.D. Wis. 2015)

88. On July 24, 2019, Cole, contacted Respondent's client supervisor Mr. Dexter about discrimination and ongoing harassment.

89. Cole also reported the same discrimination and harassment to RailWorks' on-site supervisors, Danny Bridges and Kris Hyder, via text message on July 24, 2019, stating as follows:

"[Wed, Jul 24, 7:19 PM] Hello, this is Dominque Cole I am contacting you because I have a problem with one of my Coworkers. Today as we were waiting for track time I was sitting in the truck and I was approached by Matt Folkwien and he said to me to suck his dick. I took it very disrespectful and it bothers me that another man would say that to me at work. I continued with my day after told me that. This is not the first time he as said offensive things to me. **At a point of time he called me a Nigger Several times, Jerome witnessed the whole situation. I have tried to blow it off but I see it going to continue happening…**" *See attached Exhibit B*

90. On July 25, 2019, while waiting outside to begin their workday, Plaintiff's supervisors Hyder and Keller brought all four laborers together outside to discuss the report as a group.

91. During the group discussion, Cole was not simply reporting a one-time off-color joke. Instead, he explained to Hyder and Keller that the statements and

harassment were ongoing, and other statements by Folkwein predated his July 24, 2019, complaint.

92. Among the previous statements by Mr. Folkwein are as follows:

   a. As soon as I began working for Respondent and met Folkwein he began referring to me as "Nigger."

   b. While in Paducah, Kentucky while I was traveling with Folkwein to the job site, he stated to me that "you Niggers from Chicago are crazy."

   c. Also, while in Kentucky, Folkwein stated to me that "you Niggas don't know nothing about welding rails."

   d. Also, while in Kentucky, Folkwein stated to me that "this Nigger has muscles but they are only for show," which I took mean he was saying that I am weak.

   e. Wild in the railyard, Foldwein stated that "this Nigga don't know how to swing a sledgehammer."

   f. On the way away from the job site one day, Folkwein turned on music from Tupac Shakur and stated to me that "you Niggas don't know nothing about hop hop."

   g. On the way back from the job site on another day, Folkwein stated to me that "Nigga you are a drug dealer."

   h. Throughout my time with Respondent, Folkwein repeatedly made such comments referring to me as Nigger, and also boy, and these comments have been extremely offensive to me. *See attached declaration Exhibit G.*

93. During the meeting, Beasley informed both Hyder and Keller that Matt Folkwein did in fact make the statements as described by Cole's texts.

94. Beasley also submitted a written statement regarding the July 24, 2019, incident, "I Jerome Beasley was sitting in truck with Mr. Cole and heard Mr. Folkline use explicit language to Mr. Cole that was inappropriate to Dominique." *See attached Exhibit C..*

95. During the same meeting, Jerome Beasley, in no uncertain terms, verbally informed both supervisors that Folkwein called he, Cole, and Perry "niggers" on a daily basis during the meeting.

96. Cole and Beasley informed both supervisors of the incident where Folkwein asked or directed Cole to "suck my dick."

97. In addition, Cole's text message that refers to be being called a "nigger" several times, which he verbally confirmed this with the supervisors.

98. On July 25, 2019, Beasley clearly explained to supervisors Hyder and Keller that he too was repeatedly called a "nigger" on a daily basis.

99. After Cole and Beasley informed the Defendant of the hostile work environment created by racial slurs and sexual harassment, Defendant was aware of, allowed, and encouraged the immediate and continued harassment and intimidation thereafter.

100. Mr. Folkwein, still angry that he had been reported, began welding in such a way as to purposely shoot sparks onto Mr. Cole and Mr. Beasley.

101. The shooting sparks were extremely hot and made contact with their skin and clothing.

102.     The sparks were so hot that they actually started a fire on the nearby wood, which Cole put out. *See attached Exhibit G.*

103.     Cole, with the agreement and knowledge of Beasley, then went to the Defendant's supervisors to report the retaliative sparks from Folkwein and requested the supervisors order him to put on a spark-shield for their safety.

104.     The supervisors, Keller and Hyder, simply continued with their conversation, taking no heed of Cole or Beasley's verbal reports of harassment and visible discomfort, making their job performance impossible.

105.     Supervisors, Keller and Hyder, repeatedly ignored the Plaintiffs' request for help. In lieu of assistance, Keller and Hyder knowingly encouraged and acquiesced Folkwien's retaliation for reporting discrimination and harassment.

106.     The Plaintiffs were verbally and physically intimidated not only by Folkwien, but also by the Defendant's supervisors, through their acquiescence of Folkwein's retaliation.

107.     Defendant's employees Keller and Hyder clearly stated that the Plaintiffs were not to issue further any complaints, especially to the Defendant's client.

108.     Defendant employees made it clear that Plaintiffs were not to take any action, including reporting current or continued harassment or discrimination because it will jeopardize the Defendant's relationship with railroad clients.

109.     The Defendant's actions, through its employees, created a hostile work environment.

110.    The Plaintiffs reasonably found Defendants perpetuated the hostile work

environment and allowed discrimination to be objectively and subjectively

offensive and abusive.

111.    On July 25, 2019, Cole was terminated from his employment.

112.    On July 25, 2019, Cole contacted Kris Hyder via text message:

**Cole:** "Am I fired?...Am I terminated? I just need to know what's going on??"

**Cole:** "What's going on Kris I was wondering what's going on with my situation. I was

told by Danny that I won't be working for NS anymore so will I be working for CN??

Can you please answer me back!!"

**Hyder:** "Your services are no longer needed. Good luck with your future endeavors."

113.    On or about September 13, 2019, Beasley was removed from the tracks,

allegedly for "bad" welds.

114.    On or about September 13, 2019, Beasley was constructively terminated

from work.

WHEREFORE, for the forgoing reasons, Plaintiffs Dominique Cole and Jerome

Beasley, request that this Court enter judgment in their favor and against Defendant

RailWorks Maintenance of Way, Inc., in an amount to be proved at trial, including

lost pay and benefits, compensatory damages up to and including $300,000, for

emotional distress and reputation harms, and for all such other relief to which they are

entitled, and the Court deems just and proper.

## COUNT II -TITLE VII - Retaliation
### (Plaintiffs against Defendant)

115.     Plaintiff restates, realleges, and incorporates by reference all other paragraphs of this Complaint as if fully stated herein.

116.     In order to make out a Title VII claim for retaliation, a plaintiff must demonstrate: (1) that he engaged in statutorily protected activity; (2) that his employer took a materially adverse action against him; and (3) that the protected activity and the adverse action are causally connected. Civil Rights Act of 1964 § 704, 42 U.S.C.A. § 2000e-3(a).*Robinson v. Perales*, 894 F.3d 818 (7th Cir. 2018)

117.     A materially adverse action, as required for a Title VII retaliation claim, is one which might well have dissuaded a reasonable worker from engaging in protected activity such as making or supporting a charge of discrimination. Civil Rights Act of 1964 § 704, 42 U.S.C.A. § 2000e-3(a). *Robinson v. Perales*, 894 F.3d 818 (7th Cir. 2018)

118.     Supporting a colleague's charge of discrimination by refusing to retaliate against that colleague is protected activity, as required for a Title VII retaliation claim. Civil Rights Act of 1964 § 704, 42 U.S.C.A. § 2000e-3(a).*Robinson v. Perales*, 894 F.3d 818 (7th Cir. 2018)

119.     Dominque Cole and Jerome Beasley engaged in protected activity by reporting race discrimination, sexual harassment, and physical harassment in the workplace, including supporting each other's claims.

120.     Cole also reported the same discrimination and harassment to RailWorks' on-site supervisors, Danny Bridges and Kris Hyder, via text message on July 24, 2019 stating as follows:

"[Wed, Jul 24, 7:19 PM] Hello, this is Dominque Cole I am contacting you because I have a problem with one of my Coworkers. Today as we were waiting for track time I was sitting in the truck and I was approached by Matt Folkwien and he said to me to suck his dick. I took it very disrespectful and it bothers me that another man would say that to me at work. I continued with my day after told me that. This is not the first time he as said offensive things to me. **At a point of time he called me a Nigger Several times, Jerome witnessed the whole situation. I have tried to blow it off but I see it going to continue happening…**" *See attached Exhibit B*

121.     On July 25, 2019, while waiting outside to begin their workday, Hyder and Keller brought all four laborers together outside to discuss the report as a group.

122.     During the group discussion, Cole did not only report a one-time off color joke. Instead, he explained the statements and harassment were ongoing and other occurrences predated his July 24, 2019, complaint.

123.     During the meeting, Beasley informed both Hyder and Keller that Matt Folkwein did in fact make the statements as described by Cole.

124.     Mr. Beasley also submitted a written statement regarding the July 24, 2019, incident, "I Jerome Beasley was sitting in truck with Mr. Cole and heard Mr. Folkline use explicit language to Mr. Cole that was inappropriate to Dominique." *See attached Exhibit C*.

125.     During the same meeting, Jerome Beasley, in no uncertain terms, verbally complained to both supervisors that Matt Folkwein called he, Cole, and Perry "niggers" on a daily basis during the meeting.

126.     Cole and Beasley informed both supervisors of the incident where Matt Folkwein asked Dominique Cole to "suck my dick."

127. In addition, Dominique Cole's text message that refers to be being called a "nigger" several times, Mr. Cole also verbally confirmed this with the supervisors.

128. On July 24, 2019, Mr. Beasley told supervisors Hyder and Keller that he too was repeatedly called a "nigger" on a daily basis.

129. Cole and Beasley were retaliated against because of their protected activity.

130. Cole and Beasley immediately endured retaliation after engaging in protected activity.

131. Mr. Folkwein, still angry that he had been reported, began welding in such a way as to purposely shoot sparks onto Cole and Beasley. The shooting sparks were extremely hot and made contact with their skin and clothing.

*132.* The sparks were so hot that they actually started a fire on the nearby wood, which Cole put out. *See attached Exhibit G.*

133. Cole, with the agreement and knowledge of Beasley, then went to the Defendant supervisors to report the retaliative sparks from Mr. Folkwein and requested the supervisors order him to put on a spark-shield for their safety.

134. The supervisors, Keller and Hyder, simply continued with their conversation, taking no heed of Mr. Cole or Mr. Beasley's verbal reports of harassment and visible discomfort, making their job performance impossible.

135. The Defendant, after being made aware of discrimination and harassment, allowed its employee to continue intimidating and harassing the Plaintiffs.

136. The Defendant was aware of its employee engaging in immediate retaliation for Plaintiff's engagement in protected activity.

137. Supervisors, Keller and Hyder took adverse action, including forcing the Plaintiffs to be within striking distance of the Mathew Folkwein and repeatedly ignoring the Plaintiffs' requests for help. In lieu of assistance, Keller and Hyder knowingly acquiesced and encouraged Folkwein's retaliation for reporting discrimination and harassment.

138. The Plaintiffs were verbally and physically intimidated not only by Matt Folkwien, but also by the Defendant's supervisors.

139. The Defendant's encouraged and allowed continued physical abuse is caused by Plaintiffs engaging in protected activity.

140. Defendant's employees, Keller and Hyder, made it clear that the Plaintiffs were not to issue further complaints, especially to the client railroad. *See attached Exhibit G.*

141. Defendant employees made it clear that Plaintiffs were not to take any action, including reporting current or continued harassment or discrimination because it may jeopardize the Defendant's relationship with railroad clients.

142. The Plaintiffs reasonably found Defendants perpetuated adverse actions against them to be objectively and subjectively offensive and abusive.

143. On July 25, 2019, Cole was terminated from his employment because he participated in protected activity.

144. On July 25, 2019, Cole contacted Kris Hyder via text message:

**Cole:** "Am I fired? Am I terminated? I just need to know what's going on??"

**Cole:** "What's going on Kris I was wondering what's going on with my situation. I was told by Danny that I won't be working for NS anymore so will I be working for CN?? Can you please answer me back!!"

**Hyder:** "*Your services are no longer needed*. Good luck with your future endeavors."

145.     On or about September 13, 2019, Beasley was removed from the tracks, allegedly for "bad" welds.

146.     On or about September 13, 2019, Beasley was constructively terminated from work.

147.     Defendant's retaliation continued when it constructively terminated Jerome Beasley.

148.     From June to September of 2019, he had been successfully welding without being removed, despite being observed by not only Respondent's supervisors, but also the supervisors of Respondent's clients were well.

149.     On or about September 13, 2019, Beasley was removed from the tracks and terminated.

150.     In September of 2019, after being removed from his duties, Beasley repeatedly reached out to the Respondent in an attempt to find work or be reinserted.

151.     On October 15, 2019, Jerome Beasley contacted his former supervisor Kris Hyder via text, "How's it going kris no word on anything yet." *See attached Exhibit F*. Mr. Hyder after informing Mr. Beasley "…No word yet…" he instructed him to contact Jason Deaton, who Respondent identifies as "Director Jason Deaton." *See attached Exhibit F.*

152.     Minutes later, Beasley contacted Jason Deaton as follows:

Jerome: "How you doing Jason this Jerome I was reaching out to you concerning my employment status or to see if it's possible I can 3 man with Donnie."

Deaton: "We currently don't have anything open right now, **they cut your crew off completely**. We will let you know if something comes up"

Jerome: "I didn't no that but **they let Matt still work under the same circumstances**"

153.     Beasley continued to be unable to secure a position as a welder or welder helper as retaliation for reporting discrimination not only in July of 2019, but also when he alluded to discrimination against him when compared to Folkwein in October of 2019.

154.     The Defendant's sought to prevent Beasley from being rehired to prevent any continued protected activity that might again jeopardize its business dealings with its clients.

155.     The Defendant's continued to ostracize and keep Beasley out of employment on the railroad by not rehiring him after his constructive termination.

156.     The Plaintiffs were terminated for participating in protected activity, including reporting and complaining of discrimination, harassment, and hostile work environment.

WHEREFORE, for the forgoing reasons, Plaintiffs Dominique Cole and Jerome Beasley, request that this Court enter judgment in their favor and against Defendant RailWorks Maintenance of Way, Inc., in an amount to be proved at trial, including lost pay and benefits, compensatory damages up to and including $300,000, for emotional distress and reputation harms, and for all such other relief to which they are entitled, and the Court deems just and proper.

Respectfully submitted,

**Dominique Cole and Jerome Beasley**

*/s/ Navarrio Wilkerson, Esq.*

By: _____

Navarrio Wilkerson, Esq.
Cass Casper, Esq.
Disparti Law Group, P.A.
121 W. Wacker Drive, Suite 2300
Chicago, IL 60601
T: (312) 506-5511 ext. 336
F: (312) 846-6363
navarrio@dispartilaw.com
ccasper@dispartilaw.com